OPINION
Defendant-appellant, Robert L. Wyche, appeals from the judgment of the Franklin County Court of Common Pleas in which he was convicted and sentenced in connection with the death of Rahsaan Rogers. Appellant was charged in a three-count indictment, filed November 29, 2000. Count One alleged that he purposely caused the death of Rogers, with prior calculation and design in violation of R.C. 2903.01; it included a specification, provided for in R.C. 2941.144, that, while committing the aggravated murder offense, appellant possessed an automatic firearm. Count Two of the indictment charged appellant with unlawful possession of a dangerous ordnance, an automatic firearm, in violation of R.C. 2923.17. Count Three averred tampering with evidence in violation of R.C. 2921.12.
The November 29, 2000 indictment was the second filed against appellant in relation to the death of Rogers. The first was returned by the grand jury and filed during the summer of 1998. It contained essentially the same allegations as Counts One and Two of the later indictment, but did not include a tampering with evidence charge. The first indictment was dismissed without prejudice to refiling during the spring of 1999 at the request of the prosecution after the state experienced difficulty locating key witnesses and securing their attendance at the then-scheduled trial.
During the trial from which this appeal is taken, the defense chose not to present any testimony after the prosecution had rested, but it did offer one exhibit, a lab report detailing the results of tests by the Columbus Police Department Crime Lab showing a weapon recovered from the victim to be operable. After resting, the defense moved for judgment of acquittal pursuant to Crim.R. 29(A). The motion was overruled. Following closing statements, the case was submitted to a jury. On February 12, 2001, the jury returned verdicts finding appellant guilty of aggravated murder in the death of Rahsaan Rogers, guilty of the automatic firearm possession specification, and guilty of possessing the dangerous ordnance. The jury acquitted appellant of the tampering with evidence offense.
On February 20, 2001, the trial court sentenced appellant to serve terms of imprisonment of twenty years to life at the Ohio Department of Rehabilitation and Correction for aggravated murder, twelve months for possession of a dangerous ordnance, and six years actual incarceration on the automatic firearm specification. The court ordered the six-year term for the specification to be served prior to, and consecutive with, the twenty-to-life term for aggravated murder, and the twelve-month dangerous ordnance sentence to be served concurrently with the aggravated murder sentence.
Appellant asserts two assignments of error:
First Assignment of Error
 THE TRIAL COURT ERRED WHEN IT PERMITTED THE STATE TO INTRODUCE INTO EVIDENCE DEFENDANT-APPELLANT'S RECORDED STATEMENTS TO JEREMY INGLESI, WHO WAS ACTING AS AN AGENT FOR THE STATE AT THE TIME OF THEIR CONVERSATION, THEREBY DENYING DEFENDANT-APPELLANT HIS RIGHT TO COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES.
Second Assignment of Error
 THE TRIAL COURT ERRED, DEPRIVING DEFENDANT-APPELLANT HIS RIGHT TO DUE PROCESS OF LAW UNDER THE FIFTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT FOR AGGRAVATED MURDER WITH SPECIFICATION, AND UNLAWFUL POSSESSION OF DANGEROUS ORDNANCE WHEN THE EVIDENCE WAS NOT SUFFICIENT TO SUSTAIN A CONVICTION FOR AGGRAVATED MURDER WITH SPECIFICATION AND THE MANIFEST WEIGHT OF THE EVIDENCE WOULD NOT SUPPORT CONVICTIONS ON EITHER CHARGE.
The prosecution presented evidence that, during the early morning hours of March 15, 1998, Rahsaan Rogers was shot outside an after-hours establishment known as the Heavy Metal Motorcycle Club, located near the intersection of Eleventh and Cleveland Avenues in Columbus, Ohio. At the time of the shooting, a crowd of twenty to sixty people was in the area, either leaving the club or waiting in line to enter it. When the first Columbus Police Department patrol officer arrived at the scene, he found Rogers lying on his back in the Eleventh Avenue right-of-way surrounded by bystanders, bleeding from his torso and unconscious. The officer summoned a medical squad that, upon commencing treatment, discovered the shooting victim was armed with a fully loaded handgun tucked in his waistband. There was no indication from witnesses or from the physical evidence that Rogers discharged the handgun near the time he was attacked. The officer took possession of the weapon and secured it in the trunk of his cruiser. Rogers succumbed to his wounds that same morning, soon after the shooting.
Deputy Franklin County Coroner Dr. Larry Tate, a pathologist, testified concerning the autopsy he performed on the victim. Dr. Tate identified four gunshot wounds that appeared to be entrance wounds. Two wounds were characterized as being potentially fatal. He noted that one such wound might have been caused by the same bullet that he had described as having passed through soft tissue in Rogers' arm. Two bullets were recovered from the victim's body during the autopsy. There was also a healing laceration, held closed by staples, on the victim's forehead. Dr. Tate concluded from his examination that Rogers was shot from a sufficient distance so as not to leave powder marks.
In the area near the shooting, the Columbus Police Department Crime Scene Search Unit gathered physical evidence and took photographs. The physical evidence included two spent shell casings found beside the victim, and a Glock Incorporated semi-automatic nine-millimeter handgun, equipped with a thirty-four-round ammunition magazine. The weapon was discovered in a trash dumpster less than a block from the shooting scene near the intersection of McClelland Avenue and the north-south alley parallel to, and east of, Cleveland Avenue. The firearm, magazine and bullets were examined for fingerprints, but none of the tests yielded impressions of value for identification purposes.
Mark Hardy, a criminalist with the Columbus Police Department, examined the nine-millimeter Glock handgun found in the trash dumpster to determine its operability and to compare its firing characteristics with markings on the bullets obtained during the autopsy and on the shell casings found at the shooting scene. He testified that the gun was in good operating condition. According to Hardy, the bullets had class characteristics in common with the type of weapon tested, a Glock nine-millimeter, but he could not identify sufficient markings on the bullets to conclude that they were fired from that specific gun. Regarding the shell casings, however, Hardy opined that, within a reasonable degree of scientific certainty, the casings recovered from near Rogers' body had been ejected from the gun found in the dumpster less than a block away. Hardy also tested the handgun found in the victim's waistband and concluded that it was operable, although in poor operating condition.
The state presented testimony by Tiffany White and DeShawn Craine, both of whom had been among the bystanders near the scene of the shooting. White was one of the witnesses that the prosecution had not been able to locate prior to the dismissal of the first indictment against appellant in the spring of 1999. White testified that she knew appellant and two of his associates, Troy Cleveland and Antonio Banks. She saw all three together, and she talked to them prior to the shooting in the parking lot behind the after-hours club. All three were in or near a gray car driven by Troy Cleveland and identified as being owned by Cleveland's mother.
White was also familiar with Jeremy Inglesi, a friend of Cleveland and appellant, who also testified on behalf of the state. White said she did not see him on the morning of the shooting. White also knew the victim, Rahsaan Rogers, and recalled that he exited the club shortly before being shot, explaining he was going to get cigarettes and complaining that he should not have to wait in line to re-enter. White related that, while in line, she heard gunshots and saw the victim fall to the pavement. At the same time, she noticed a man in a dark-hooded sweatshirt with the hood pulled up running away, between two homes on the north side of Eleventh Avenue. White could not see the face of the man in the hooded sweatshirt and could not identify him. She was sure, however, that it was neither Banks, because of the way he was dressed that morning, nor Cleveland, because of his build and weight.[1]
Craine testified that he knew neither appellant nor the victim. He saw a man dressed in a dark-hooded sweatshirt with the hood pulled up exiting a gray car in the alley behind the Heavy Metal Motorcycle Club parking lot near the same location where White testified she had seen appellant, Cleveland and Banks in or beside the car belonging to Cleveland's mother. That man walked down the street with his hand in his sweatshirt pocket "like he was about * * * to do something." Craine did not hear any argument or exchange of words between the man in the hooded sweatshirt and the victim. The assailant just walked up to the victim and fired "about three gunshots." After hearing the gunfire, Craine saw the man in the hooded sweatshirt run between the houses on the north side of Eleventh Avenue and get back into the same gray vehicle. The vehicle had moved to that location in the alley north of Eleventh near McClelland Avenue, close to the dumpster where the Glock nine-millimeter handgun was later discovered. The gray car left the area as the first police cruiser was arriving.
George Hall, a gun dealer from Circleville, identified the Glock nine-millimeter handgun as a police trade-in, probably once belonging to the Washington, D.C. Police Department, that he had sold. He remembered selling the gun from his gun show booth at the Pickaway County Fairgrounds to a large black male accompanied by a smaller, slim white male. He did not recall selling the high-capacity ammunition magazine found with the Glock nine-millimeter.
Two additional witnesses for the prosecution were Mary Moore and Michael Murray. Moore is the owner of the Triad Lounge located on Eleventh Avenue near the Ohio State Fairgrounds. She described a fight that broke out in her establishment on or about March 7, 1998, among some people that were not regular customers. She told of a large black male hitting a short black male over the head with a cue stick, but was not able to identify the participants. As the result of the disturbance, she cleared the bar and closed early that evening.
Murray also testified about the fight at the Triad and was able to identify the participants. He had gone to the Triad with Rogers, a life-long friend. Rogers and appellant argued. Murray tried to intervene and got into a physical altercation with appellant. Then Cleveland and Inglesi, who were with appellant that night, became involved in the fight. Inglesi struck Murray in the face and Cleveland hit Rogers in the forehead with a pool cue. Rogers and Murray eventually left the bar and sought medical treatment. Murray indicated that the laceration on Rogers' forehead, closed by staples as shown in the autopsy photographs that were introduced into evidence, was caused by the blow to the head inflicted upon Rogers by Cleveland during the altercation at the Triad Lounge.
Inglesi was a key witness for the prosecution. He had known Cleveland since childhood and had also been friends with appellant and Banks for four-to-five years. Inglesi was arrested in 1997 on a serious federal drug offense for which he faced a possibility of the imposition of a mandatory minimum ten-year sentence and up to a maximum penalty of life in prison. In connection with that pending federal case, Inglesi began cooperating with the Federal Bureau of Investigation ("FBI") in the agency's investigation of other narcotics activities. Among the agreements Inglesi made, in the hope of minimizing his punishment in the federal prosecution, was a promise to cooperate with, and testify on behalf of, both federal and state[2] authorities in several narcotics and homicide investigations. Although Inglesi did not sign a formal plea agreement until the day appellant's trial commenced, he stated that he had been working undercover with the FBI for more than a year prior to testifying pursuant to the understanding reflected in the formal document. He also acknowledged having worked as an informant since early in 1998.
Inglesi testified about the fight at the Triad Lounge involving himself, Cleveland, Murray,[3] Rogers and appellant. Inglesi related that he became aware of talk by Rogers about getting back at appellant. Inglesi also identified the Glock nine-millimeter handgun and extended ammunition clip recovered from the trash dumpster near the scene of the homicide as one belonging to Cleveland. He recalled accompanying Cleveland, David Peoples and, possibly, appellant, and one or two other friends to the Circleville Gun Show where either Peoples or Cleveland purchased the gun. He remembered that the extended ammunition clip was purchased from a different dealer at the same show.
On March 15, 1998, the morning of the shooting, Inglesi was home with his girlfriend and her child when he received a phone call from Cleveland. He was aware that appellant was with Cleveland because he heard him in the background. Inglesi then went outside the apartment and met Cleveland and appellant. Cleveland was driving the gray car that belonged to his mother. Appellant was in the car with Cleveland and was wearing a black-hooded sweatshirt and black pants. Inglesi testified that he got into the back seat of the gray car. Cleveland and appellant told him they had caught Rogers down by the Heavy Metal Motorcycle Club and they shared details about the shooting. Cleveland wanted Inglesi to let appellant stay with him, but Inglesi refused because it was his girlfriend's apartment and her daughter was there. Instead, Inglesi agreed to go down to where the shooting occurred and to look for Cleveland's gun. According to Inglesi, appellant told him to look in a trash can in the alley north of Eleventh Avenue. Cleveland was angry with appellant for discarding the gun. Inglesi did drive to that alley, but did not exit the car he was using because police officers were still at the scene.
Several days later, Inglesi contacted the Franklin County Sheriff's Detective Bureau to report what he knew about the homicide. He had begun cooperating with that agency by furnishing information not long after his arrest in 1997, before any plea agreement on his pending federal drug charge was negotiated. He was also cooperating with the FBI by that time. During April 1998, Inglesi met with, and provided a statement to, the Columbus Police Department detective coordinating the investigation of the Rogers homicide. Thereafter, Inglesi worked primarily with federal agents as a narcotics informant, purchasing drugs, sometimes under videotaped FBI surveillance.
On March 24, 2000, after Inglesi had started working for the FBI pursuant to the negotiated understanding that culminated in his formal plea agreement, he arranged to meet with appellant. An FBI agent supplied him with a car equipped with a listening device for the purpose of recording his conversation with appellant. The meeting was his third or fourth with appellant during which the Rogers homicide was discussed, but the first to be recorded. Inglesi made up a story that he heard someone associated with Rogers' brother, Donerick, was to soon be released from jail and had been talking about going after appellant and Cleveland to avenge Rogers' death. While appellant did not expressly admit killing Rogers during this taped conversation, he did make statements concerning the specifics of the killing. For example, appellant acknowledged that Rogers was "shutting the trunk" of his car when appellant caught him. Appellant also stated: "Ain't nobody seen my face."
The audiotape was played to the jury over appellant's objection. The trial court overruled the objection because the conversation recorded did not occur in the midst of a custodial interrogation and the recording was made at a time when no indictment or other formal proceeding was pending against appellant. The trial court reasoned that the circumstances under which the tape was made did not require excluding or suppressing it on Sixth Amendment grounds. In his first assignment of error, appellant challenges this ruling, contending that, even though the original indictment against appellant had been dismissed, his Sixth Amendment right to counsel attached upon the initiation of that first prosecution and survives the dismissal where there is a clear intention to re-indict him for the same or similar offenses.
The Sixth Amendment, as applied to the states through the Fourteenth Amendment, guarantees that, in all criminal prosecutions, the accused shall enjoy the right to have the assistance of counsel for his defense. McNeil v. Wisconsin (1991), 501 U.S. 171, 175. The Sixth Amendment right to counsel does not attach until a prosecution is commenced, that is, after the initiation of adversary criminal proceedings by a formal charge, a preliminary hearing, an indictment, an information or an arraignment. Kirby v. Illinois (1972), 406 U.S. 682, 689. Once the right has attached and has been asserted by the accused, the Sixth Amendment provides a right to counsel at all critical stages of the proceedings. Spano v. People of the State of New York (1959), 360 U.S. 315,327 (concurring opinion by Justice Stewart).
A critical stage of the proceedings includes, after indictment, any attempt by the government to elicit information from the accused concerning the charged crime. Michigan v. Jackson (1986), 475 U.S. 625,630; and Massiah v. United States (1964), 377 U.S. 201, 206. Incriminating statements concerning pending charges are inadmissible at trial if the state, in obtaining the evidence, knowingly circumvents the right of an accused to have counsel present in a confrontation between the accused and a state agent. Maine v. Moulton (1985), 474 U.S. 159,171. However, the Sixth Amendment right to counsel is offense specific, Texas v. Cobb (2001), 532 U.S. 162, 121 S.Ct. 1335, 1340; following McNeil, at 175; and it cannot be invoked once for all future prosecutions. Id.
Common among the cited Sixth Amendment cases is a focus upon the adversary positions in which the government and the accused are placed after the formal initiation of criminal charges. As noted by the Supreme Court of the United States in Michigan v. Jackson, at 632:
 * * * [A]fter a formal accusation has been made — and a person who had previously been just a "suspect" has become an "accused" within the meaning of the Sixth Amendment — the constitutional right to the assistance of counsel is of such importance that the police may no longer employ techniques for eliciting information from an uncounseled defendant that might have been entirely proper at an earlier stage of their investigation. * * *
The police interrogated Jackson and another defendant in an unrelated murder case while in custody after both had requested appointed counsel at their respective arraignments. The questioning took place prior to either defendant having the opportunity to learn the identity of or to consult with the appointed counsel. Both confessed during the police-initiated custodial interrogation, and their confessions were admitted into evidence at trial. Their convictions were reversed because the confessions were obtained in violation of the Sixth Amendment right to counsel and, therefore, should have been excluded. Even though both defendants had been advised of their rights under Miranda v. Arizona (1966), 384 U.S. 436, and the Fifth Amendment, the court ruled that having asserted their right to counsel in the then-pending case under the Sixth Amendment, any waiver of that right during a police-initiated interrogation is invalid. Michigan v. Jackson, at 636.
In Massiah, Sixth Amendment protection was afforded in the context of non-custodial, surreptitious interrogations while criminal charges were pending. The defendant was indicted on May 28, 1958, and charged with possession of cocaine.[4] On July 20, 1959, a superseding indictment was returned against him and two co-defendants on charges of conspiracy to violate narcotics laws. Massiah retained counsel in connection with the conspiracy indictment, pleaded not guilty and was released on bail. While that indictment was pending, one of the co-defendants agreed to cooperate with the government and did so by permitting a customs agent to place a transmitting device in his vehicle during a meeting of November 19, 1959, between Massiah and his co-defendant to talk about their pending charges. The federal agent listened in and was permitted to testify about the conversation he eavesdropped on at the trial of a second superseding indictment returned on March 3, 1961, which added additional counts, defendants and listed fourteen co-conspirators.[5]
Characterizing the period from the time of arraignment until the beginning of trial as "perhaps the most critical period of the proceedings," the Supreme Court of the United States reversed Massiah's convictions on Sixth Amendment grounds, holding:
 * * * [He] was denied the basic protections of that guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel. * * * [Massiah, at 206.]
The Moulton decision also involved the admission at trial of incriminating statements after the defendant had been indicted on four counts of theft by receiving and was represented by retained counsel. The incriminating statements were made during a secretly recorded meeting with a co-defendant for the purpose of discussing the upcoming trial of charges against them. Neither of the participants was in custody at the time of the meeting. However, the co-defendant had negotiated a plea agreement and was cooperating with the prosecution. Recording equipment was furnished to the co-defendant by the local law enforcement agency that had not only investigated the original crimes charged, but also continued to gather information about other possible criminal activity by Moulton, including threats to potential witnesses. After the co-defendant's role as an informant was disclosed to Moulton, the pending indictments were dismissed and new indictments were returned alleging the original counts as well as burglary, arson and three additional thefts. The incriminating statements made by Moulton to his co-defendant were introduced during the trial on the new indictments, and Moulton was convicted. The Supreme Court of the United States affirmed the Maine Supreme Court's reversal of the conviction and stated:
 * * * The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a "medium" between him and the State. * * * [T]his guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right. The determination whether particular action by state agents violates the accused's right to the assistance of counsel must be made in light of this obligation. * * * [K]nowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. * * * [Moulton, at 176.]
The Supreme Court of the United States, more recently in its Cobb decision, declined to exclude the defendant's confession that he killed a neighbor and her daughter while burglarizing their home in December 1993. During July 1994, Cobb confessed to the burglary, but denied any knowledge concerning the disappearance of the woman and her daughter. He was indicted on the burglary offense and counsel was appointed to represent him in his defense against that indictment. During the later part of 1994, and again in September 1995, the police interrogated the defendant concerning the disappearances. These interviews were conducted with the knowledge and permission of Cobb's appointed lawyer. The defendant's father later reported to the authorities in November 1995, that his son, free on bond in the burglary case, had made self-implicating statements concerning the murders as well. The police then took Cobb into custody and questioned him again concerning the missing burglary victims without his attorney being present. The defendant waived his rights under Miranda and confessed to having killed his neighbor and her daughter during the commission of the burglary.
That confession was later admitted into evidence at Cobb's trial and he was convicted of the murders. The Supreme Court of the United States reversed the judgment by the Texas Court of Criminal Appeals that reversed the convictions for the reason that the confession should have been excluded on Sixth Amendment grounds. In affirming Cobb's murder convictions, the Supreme Court followed its previous ruling in McNeil that the Sixth Amendment right to counsel is "offense specific," and declined to broaden the scope of Sixth Amendment protection beyond pending crimes to other uncharged offenses that may be factually related. Cobb, at 1340-1341. In reaching this conclusion, the Cobb court used a double jeopardy analysis to determine if an offense not formally charged is one to which Sixth Amendment protections nonetheless attach as being the same offense or a lesser-included offense of the pending case. Cobb, at 1343; citing Blockburger v. United States (1932), 284 U.S. 299.
In contrast to the line of cases previously discussed, there was no pending charge against appellant at the time his conversation with Inglesi was recorded. The original indictment had been dismissed almost a year earlier. Whether the Sixth Amendment right to counsel extends beyond the "pending case" and survives a nolle prosequi, or dismissal without prejudice to refiling, of a once-pending indictment is a question not yet directly addressed by either the Ohio courts or the Supreme Court of the United States. We might infer from the double jeopardy analysis used in Cobb that the possibility of re-indictment for a once-dismissed offense requires the Sixth Amendment right to counsel to survive the dismissal and be extended indefinitely into the future in expectation of re-indictment. However, "[c]onstitutional rights are not defined by inferences from opinions that did not address the question at issue." Cobb, at 1341.
In United States v. Montgomery (C.A.4, 2001), 262 F.3d 233, the issue was addressed directly. One of the defendants had been charged with murder in the state court in July 1993. The state court indictment was dismissed in November 1993. The accused contended that, because his Sixth Amendment right to counsel attached at the time of the July 1993 indictment, an undisputed aspect of the case, a taped statement made to a federal informant during October 1994 should have been excluded from evidence in his later federal prosecution for the same murder. The Fourth Circuit Court of Appeals construed the McNeil and Cobb decisions to mean that "[n]either the Sixth Amendment nor the Supreme Court's explication of the rights guaranteed by it" were intended to "provide a once-indicted defendant with a permanent constitutional shield." Montgomery, at 246. Upon dismissal of the state indictment, the respective positions of the government and defendant ceased being adversarial for Sixth Amendment right to counsel purposes. Id., citing McNeil, at 178. The defendant is no longer an accused for Sixth Amendment purposes, but, instead, is only a suspect. Michigan v. Riggs (1997), 223 Mich. App. 662, 699; citing Michigan v. Jackson, supra.
We conclude that the Sixth Amendment right to counsel on a particular charge should not extend in perpetuity after a dismissal without prejudice. The continuation of the Sixth Amendment right after dismissal or nolle prosequi of the original charges is only warranted to protect against a deliberate effort by government representatives to circumvent the Sixth Amendment rights of the accused by dismissing an original charge for the purpose of obtaining an incriminating statement to be used in a later prosecution against the same accused. See Riggs v. Yukins (2001), E.D. Mich. Case No 00-CV-70134-DT, unreported; quoting United States v. Holland (D.Md. 1998), 59 F. Supp.2d 492, 504, affirmed by Montgomery, supra. The record in this case does not support a conclusion that the state or its representatives participated in "deliberate chicanery * * * intended to subvert appellant's rights." Montgomery, at 247; see, also, United States v. Bartelho (C.A.1, 1997), 129 F.3d 663,675. The dismissal without prejudice of the first indictment was because of failure to locate a key witness. It was not chicanery or improper to continue to investigate or attempt to develop additional evidence prior to re-indictment. Accordingly, appellant's first assignment of error is overruled.
By his second assignment of error, appellant asks us to reverse the convictions on the additional grounds that they were not supported by sufficient evidence as a matter of law and that the trial court's judgment was against the manifest weight of the evidence. If we decide that the evidence is sufficient as a matter of law, we must then consider whether or not its manifest weight supports the conviction. State v. Thompkins (1997), 78 Ohio St.3d 380, 388; quoting Tibbs v. Florida (1982), 457 U.S. 31, 41-43.
To reverse a conviction because of insufficient evidence, an appellate court, after reviewing the evidence in a light most favorable to the prosecution, must determine as a matter of law that a rational trier of fact could not have found the essential elements of the crime proved beyond a reasonable doubt. State v. Jackson (2001), 92 Ohio St.3d 436,440; citing State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. Sufficiency is a test of adequacy, a question of law. State v. Rowland (Sept. 25, 2001), Franklin App. No. 01AP-4306, unreported; and Thompkins, at 386; citing State v. Robinson (1955),162 Ohio St. 486. The appellate court may neither resolve evidentiary conflicts in the defendant's favor nor substitute its assessment of the credibility of the witnesses for that of the trier of fact. State v. Murphy (2001), 91 Ohio St.3d 516, 543; see, also, State v. Willard (Aug. 16, 2001), Franklin App. No. 01AP-45, unreported, citing State v. Millow (June 15, 2001), Hamilton App. No. C-000524, unreported. A conviction based upon legally insufficient evidence amounts to a denial of due process. Thompkins, at 386; citing Tibbs, at 45. If an appellate court sustains an insufficient evidence claim, the state will be barred from retrying defendant. Willard, at 19; citing State v. Freeman (2000),138 Ohio App.3d 408, 424.
Appellant argues that proof of prior calculation and design is not sufficient as a matter of law and that the evidence is not adequate to support the conclusion that appellant possessed the automatic firearm used in the shooting. No bright-line test exists upon which to determine that prior calculation and design has been proved, so that issue must be decided on a case-by-case basis. State v. Jackson, at 441; citing State v. Taylor (1997), 78 Ohio St.3d 15, 20. Where the evidence shows sufficient time and opportunity to plan an act of homicide, as well as circumstances surrounding the act consistent with a scheme for implementing a calculated decision to kill, the trier of fact is justified in finding prior calculation and design. Id., citing State v. Cotton (1978), 56 Ohio St.2d 8, paragraph three of the syllabus. Proof of sufficient time and reflection, together with actions consistent with that reflection, are indicia that a homicide is committed with prior calculation and design. Id., citing State v. Goodwin (1999),84 Ohio St.3d 331, 343-345; and State v. Campbell (2000),90 Ohio St.3d 320, 330. By contrast, evidence of a "brief, explosive situation," fright, provocation or an "instantaneous eruption" is counter-indicative of prior calculation and design. Campbell, at 331; quoting State v. Jenkins (1976), 48 Ohio App.2d 99, 102; and citing State v. Reed (1981), 65 Ohio St.2d 117.
Evidence was presented that a Glock semi-automatic handgun equipped with a thirty-four round magazine was found in a trash dumpster in the alley north of Eleventh Avenue parallel to Cleveland Avenue. Two spent shell casings were recovered from near the victim's body. Forensics testimony indicated that the shell casings were expelled from the Glock handgun and, thus, supports the conclusion that the handgun found in the dumpster was the weapon used to fatally wound Rogers.
White placed appellant at the scene of the homicide in a gray car driven by Cleveland that belonged to his mother. She also described a man dressed in a dark-hooded sweatshirt running away from the area where Rogers was shot, cutting between two houses on the north side of Eleventh Avenue. Craine described a man in a dark-hooded sweatshirt exiting a gray car near where White had seen appellant who walked purposefully toward the victim before firing three rounds with no apparent, immediate provocation. Craine's testimony further indicated that the assailant fled between the houses on the north side of Eleventh and got back into the same gray car that had moved to a location in the alley north of Eleventh, near the dumpster where the Glock nine-millimeter handgun was later found. The gray car left the area as the police were arriving, according to Craine.
Inglesi testified that, shortly after the shooting, he received a phone call from Cleveland and then saw appellant, dressed in a black-hooded sweatshirt, with Cleveland in the gray car that belonged to Cleveland's mother. Appellant and Cleveland shared details of the just-committed homicide with Inglesi. Inglesi went to the area of the shooting to look for a dumpster where a firearm belonging to Cleveland had been discarded, but did not get out of his car because police officers were present. Inglesi described how Cleveland first came into possession of the firearm at a gun show in Circleville, Ohio, and he detailed the circumstances surrounding an earlier altercation that involved appellant, Cleveland and Rogers at the Triad Lounge.
The testimony of White, Craine and Inglesi, if believed, together with the physical evidence tying the shell casings to the murder weapon, are sufficient to permit a rational trier of fact, viewing that evidence in a light most favorable to the prosecution, to find that appellant was the man in the dark-hooded sweatshirt and that he shot Rogers with the Glock nine-millimeter handgun. Moreover, testimony from White and Craine describing the actions of the man in the dark-hooded sweatshirt immediately prior to, during and after the shooting is adequate evidence, when viewed according to the proper standards, to support the conclusion that appellant had the time and opportunity to reflect about killing Rogers. Proof presented of: (1) his purposeful gait; (2) the number of shots fired without apparent provocation; (3) his direct flight to an awaiting vehicle; and (4) the discarding of the murder weapon, is evidence that supports a conclusion by a rational trier of fact that this homicide was committed with prior calculation and design. The incriminating statements by appellant that were part of the tape-recorded conversation, the admission of which appellant challenged in his first assignment of error, corroborate what is otherwise sufficient evidence as a matter of law.
The evidence with respect to the automatic firearm specification and the offense of possession of a dangerous ordnance is likewise sufficient as a matter of law. R.C. 2923.17 provides, "No person shall knowingly acquire, have, carry or use any dangerous ordnance." "Dangerous ordnance" is defined in R.C. 2923.11(K)(1) to include "any automatic or sawed-off firearm." The definition of "automatic firearm" includes "any semi-automatic firearm designed or specially adapted to fire more than thirty-one cartridges without reloading." Here, the Glock nine-millimeter handgun found in the trash dumpster and from which, according to the testimony of the state's firearms expert, the two shell casings discovered near the body of the victim were expelled, was described as a semi-automatic firearm, that is, one equipped with thirty-four-round ammunition magazine and which automatically ejects spent casings out the side port. From the evidence presented, the jury was justified in its conclusions that appellant possessed an automatic firearm while committing aggravated murder and that he knowingly possessed a dangerous ordnance.
A manifest weight argument, as opposed to one that addresses sufficiency, requires the reviewing court to engage in a limited weighing of the evidence to determine whether there is enough competent, credible evidence so as to permit reasonable minds to find guilt beyond a reasonable doubt and, thereby, to support the judgment of conviction. State v. Brooks (Sept. 25, 2001), Franklin App. No. 00AP-1440, unreported; citing Thompkins, at 387. Issues of witness credibility and concerning the weight to attach to specific testimony remain primarily within the province of the trier of fact, whose opportunity to make those assessments is superior to that of the reviewing court. State v. Bezak (Feb. 18, 1998), Summit App. No. C.A. 18533, unreported; citing State v. DeHass (1967), 10 Ohio St.2d 230, 231. Nonetheless, the appellate court must review the entire record. With caution and deference to the role of the trier of fact, the reviewing court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way, creating such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against a conviction. Bezak, at 5-6; citing Thompkins, at 387.
Consistent with our discussion concerning sufficiency of the evidence, we do not find from our review of the record that the jury "clearly lost its way" in finding proof beyond a reasonable doubt as to every element of the crimes for which appellant was convicted and later sentenced. The decisions to believe or disbelieve the testimony of the witnesses and the assessment of the weight to attribute to each were considered by the jury. Enough competent, credible evidence was presented to permit reasonable minds to find guilt beyond a reasonable doubt.
Appellant's second assignment of error is overruled.
Appellant's assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
PETREE and LAZARUS, JJ., concur.
McCORMAC, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution
[1] Cleveland is described in state's Exhibit EE, a Columbus Police Department record dated May 27, 1998, as being 6'2" tall and weighing 275 pounds.
[2] The Franklin County Prosecutor's Office was aware of Inglesi's cooperation and the Assistant Franklin County Prosecuting Attorney, who was trial counsel in the case sub judice, signed the negotiated plea agreement in the capacity of "Special Assistant U.S. Attorney."
[3] Inglesi did not know Murray's name, but he described the person who was with Rogers. His testimony about the incident at Triad that evening was generally consistent with Murray's testimony relating to the same events, and it is clear that the person he referred to as the man with Rogers was Murray.
[4] See United States v. Massiah (1962), 307 F.2d 62, 64-65.
[5] See United States v. Massiah (1962), 307 F.2d 62, 65.